UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————

N.º 05 Civ. 3297 (RJS)

———————————

SUSAN SCHNUR,

Plaintiff,

VERSUS

CTC COMMUNICATIONS CORPORATION GROUP DISABILITY PLAN,

Defendant.

———————————

OPINION AND ORDER
March 29, 2010

———————————

RICHARD J. SULLIVAN, District Judge:

Plaintiff Susan Schnur brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, alleging that she was wrongfully denied disability benefits by CNA Group Life Assurance Company ("CNA") under the terms of a long-term disability plan funded by her former employer, CTC Communications Corp. ("CTC Corp.").

Now before the Court are the parties' cross-motions for summary judgment. Defendant CTC Communications Corporation Group Disability Plan ("LTD Plan" or "the Plan") and its insurer, Third-Party Defendant Continental Casualty Company ("CCC," and together with the Plan, the "Defendants"), move for summary judgment, claiming that their decision to deny Plaintiff's claim for benefits was not arbitrary and capricious. Plaintiff moves for summary judgment claiming that she is entitled to benefits under the the Plan.

For the reasons set forth below, Defendants' motion for summary judgment is granted, and Plaintiff's cross-motion for summary judgment is denied.

I. BACKGROUND

The Court has taken the facts described below from the parties' 56.1 statements and CNA's claim file on Plaintiff, as well as additional documentation provided by the parties.[1]

---

[1] Where only one party's Rule 56.1 statement is cited, the opposing party does not dispute that fact or

A. Facts

From May 18, 2000 to November 27, 2001, CTC Corp. employed Plaintiff as a Technical Service Coordinator and then as a Network Designer. (Defs.' 56.1 ¶ 1.) As a benefit of her employment, Plaintiff was covered by a long-term disability plan established by CTC Corp. (the LTD Plan). (*Id.* ¶¶ 5-6; Decl. of Joye Kelly Ex. C (the Administrative Record or "SS") 5-27.) Plaintiff submitted a claim for benefits under the Plan on March 11, 2002. (Defs.' 56.1 ¶ 31.) Plaintiff's claim for long term benefits was initially denied on July 2, 2002 (*id.* ¶ 128), and again denied on appeal on May 2, 2003 (*id.* ¶ 204). This lawsuit followed.

1. The LTD Plan

CTC Corp. maintained the LTD Plan as Plan Administrator. (Defs.' 56.1 ¶¶ 8, 10.) The Plan provided long-term benefits to disabled employees and was insured by CCC. (Defs.' 56.1 ¶ 8.)

The LTD Plan provided that an employee is "disabled" if she was physically or mentally impaired to the point where she was "(1) continuously unable to engage in any occupation for which [she was or became] qualified by education, training or experience; and (2) not working for wages in any occupation for which [she was or became] qualified by education, training or experience." (SS at 12.)

The LTD Plan granted CCC "discretionary authority to determine [participants'] benefits and to interpret the terms and provisions of the policy." (*Id.* at 10.)

2. The Reinsurance Agreement

On March 31, 2001, CCC entered into a reinsurance agreement and an administrative services agreement with American Casualty Company of Reading, Pennsylvania as insurer and CNA as reinsurer of the LTD Plan policy. (Defs.' 56.1 ¶ 19.) The administrative services agreement effectively appointed CNA as claims administrator for the LTD Plan. (*See* Decl. of Jeffrey A. Becker Ex. E ("Administrative Services Agreement") at 3.)

3. Plaintiff's Claim

Around August 2001, Plaintiff received an insect bite on her right leg and her physician diagnosed her with Lyme disease. (SS at 155, 398.) As a result of her illness, Plaintiff stopped working at CTC Corp. on November 27, 2001. (Defs.' 56.1 ¶ 28.) Soon after, she submitted a claim for short-term disability benefits as a result of "weakness, positive Lyme test, [and a history of] swollen knees." (SS at 514.) Plaintiff then applied for and was granted New York State short-term disability insurance benefits from December 3, 2001 through February 26, 2002. (Defs.' 56.1 ¶ 29.) On March 11, 2002, Plaintiff applied for long-term disability benefits under the LTD Plan. (*Id.* ¶ 31.)

   a. Initial Claim Evaluation

On March 11, 2002, Plaintiff submitted a physician statement completed by her personal physician, Dr. Daniel J. Cameron, and an employee statement completed by Plaintiff, with her application. (Defs.' 56.1 ¶ 32.) In the physician statement, Cameron diagnosed Plaintiff with Lyme disease based on a "positive Lyme test." (SS at 393.) In addition, he listed neurological and rheumatologic complications of Lyme

---

has offered no admissible evidence to controvert that fact.

2

disease with symptoms including headache, fatigue, bad knee pain, poor memory and concentration, and chest pain.  (*Id.*) Cameron also wrote that Plaintiff was "limited in physical function to brief light activities," had "reduced ability to complete simple tasks," and suffered "prolonged flare ups with mild activities." (*Id.* at 394.)

CNA assigned Michael Mitrani, a disability specialist, to review Plaintiff's claim. (Defs.' 56.1 ¶ 42.) Mitrani collected a series of documents from both Plaintiff and Cameron, including information relating to her job activities and all of Cameron's records. (*Id.* ¶¶ 46-51.) Mitrani also sought and received a physical demands analysis, which set forth the physical abilities required for Plaintiff's job, and a job description from Plaintiff's former employer, CTC Corp. (*Id.* ¶¶ 51-52.) Finally, on May 26, 2002, Mitrani asked Plaintiff to begin to keep a daily log of her activities for the period of May 13, 2002 through May 26, 2002. (*Id.* ¶¶ 55-56.)

According to the physical demands analysis, Plaintiff's position at CTC Corp. required roughly four hours of sitting at one time, half an hour of standing at one time, and half an hour of walking at one time. (SS at 372-73.)  Her position did not require any pulling, pushing, lifting, or carrying. (*Id.*) It did require the use of a telephone and computer (*id.*) and frequent automobile travel in the New York, New Jersey, and Connecticut tri-state area. (*Id.* at 550.)

Mitrani also collected information from Plaintiff's treating physicians, an independent reviewing physician, and a private investigator.  The Court will briefly review those materials.

i.   Dr. Cameron

Cameron was Plaintiff's primary physician throughout her diagnosis and application for benefits.  He is an internist and epidemiologist, as well as a member of the International Lyme and Associated Disorders Society. (SS at 158.)  He has published and presented on the subject of Lyme disease for more than ten years. (*Id.*)

Cameron's records reveal that he first examined Plaintiff in his office on September 20, 2001. (*Id.* at 155.) Cameron's notes from the visit also indicate that a test for Lyme disease done three weeks prior was negative. (*Id.* at 399.) From September 24, 2001 through October 26, 2001, Cameron prescribed tetracycline, an oral antibiotic used to treat bacterial infections. (Defs.' 56.1 ¶ 64.) On September 25, 2001, Plaintiff took two Lyme disease screening tests:  a Western blot that was indeterminate (SS at 519), and an ELISA analysis that was positive (*id.* at 520).

At an October 30, 2001 visit with Cameron, Plaintiff reported cognitive dysfunction — including an inability to focus, forgetting phone calls, and forgetting words — that interfered with her work. (*Id.* at 401.)  Physically, Plaintiff reported having such difficulty getting out of bed that she had to "force [her] body to move," suffered a stiff neck, joint pain, and suffered from nausea. (*Id.*)  From October 30, 2001 until January, 2002, Cameron continued to see Plaintiff almost daily to administer Rocephin, an intravenous antibiotic that he had prescribed. (Defs.' 56.1 ¶ 67.)

ii.   Dr. Bernstein

Within Plaintiff's claim file is also a February 22, 2002 report prepared by Dr.

3

Steven Bernstein. The report discussed the results of an ultrasound conducted on Plaintiff's right lower extremity and right wrist. (SS at 497.) The ultrasound was normal. (*Id.*)

### iii. Dr. Schoenberg

On April 24, 2002, Dr. Norman Schoenberg conducted an MRI of Plaintiff's brain that found a "[n]ormal MRI appearance of the brain" and "[n]o evidence of territorial infarct, mass effect or subdural collection." (SS at 397.) On that same date, Schoenberg also conducted an MRI of Plaintiff's cervical spine, from which he found (1) "straightening of the cervical spine, which may be due to muscle spasm"; (2) "degenerative disc disease of the C5-6 level with a prominent dorsal protrusion"; (3) "mild to moderate bilateral neuroforaminal stenoses are present, which may result in occasional arm parethesias due to contact with either C6 nerve root"; and (4) "concurrent mild central stenosis . . . with spinal cord contact but without spinal cord compression nor displacement." (*Id.* at 481-82.)

### iv. Surveillance by Investigative Options

CNA retained Investigative Options, a private investigation company, to conduct surveillance of Plaintiff on four occasions in May 2002. (SS at 315-16.) At that time Schnur was living with her sister in Stony Point, New York. (*Id.* at 376.) On May 17, 2002, Chris McDonald, an Investigative Options surveillance technician, reported that at 11:54 a.m. he observed Plaintiff "exit [her] residence carrying a large cardboard box that appeared to be sealed with packaging tape." (*Id.* at 352.) At 12:36 p.m., McDonald again observed Plaintiff, this time walking around a minivan and smoking a cigarette. (*Id.*) She then got into the minivan as a passenger and departed the area. (*Id.* at 352-53.) McDonald followed the van as its occupants ran errands until they returned to Plaintiff's residence at 1:51 p.m. (*Id.* at 354.) During this hour, McDonald reported observing Plaintiff extending her arm outside the van window "with a lit cigarette where she demonstrated a full range of movement with her right arm while smoking the cigarette." (*Id.* at 353.) He also observed her enter and leave the vehicle, bend over, and help a child into the vehicle. (*Id.* at 353-54.)

Michael Romero, another Investigative Options surveillance technician, went to Plaintiff's residence on May 22, 2002 and conducted surveillance all day. (*Id.* at 318.) He did not see Plaintiff or her vehicle the entire day. (*Id.*) The next day he was informed by Plaintiff's sister that Plaintiff was away house sitting in Suffern, New York, about fifteen miles from Stony Point. (*Id.* at 320.) The next day, May 24, 2002, Romero was again informed by Plaintiff's sister that Plaintiff was away and that she did not know when Plaintiff would return. (*Id.* at 321.)

On May 31, 2002, Steve Weiner, an Investigator at Investigative Options, personally interviewed Plaintiff at her residence. (*Id.* at 348.) There, he retrieved the fourteen-day activity log Plaintiff had been given by CNA and interviewed her about her disability and daily activities. (*Id.* at 347-48.) Plaintiff reported to Weiner that she had been home the entire previous week and had only driven her car to her doctor's office twice. (*Id.* at 291.) She did not report house-sitting in Suffern, as her sister had told Romero, or offer any other explanation as to her whereabouts on May 22 and May 24, 2002. (*Id.*)

4

### v. Statement of Daily Activities and Daily Activity Log

Plaintiff reported in her statement of daily activities that she needed help caring for her daily personal needs, including washing and preparing food, and that she did not perform chores around her home. (SS at 338-39.) She also wrote that her sister did the cooking, although Plaintiff was able to microwave food, and that she "mostly" needed help shopping. (*Id.*) She also reported that she drove "sometimes." (*Id.* at 340.)

Plaintiff's daily activity log, filled out from May 13 through May 26, 2002, indicated that Plaintiff typically woke up around 8 a.m. each day and went to sleep between 6 p.m and 8 p.m. (*Id.* at 324-37.) Her only activities, other than eating and bathing, were daily visits to her physician for her IV treatment and, occasionally, a trip to a store. (*Id.*) On May 17, 2002, the day McDonald had observed her, she recorded that she had awakened at 8 a.m., had difficulty getting up and out of bed, had a light breakfast and medication, and returned to bed by 9 a.m. (*Id.* at 333.) She indicated that she again woke up around 12:30 p.m., got out of bed for a short time for medications and food, but was back to bed within an hour. The next notation was not until 3:30 p.m., when Plaintiff reported that she went to her physician for her IV treatment. (*Id.*) Plaintiff's logs for May 22 and May 24, 2002, the days that Plaintiff's sister reported that she was in Suffern, are similar. (*Id.* at 326, 328.) On May 22, the activity log reveals entries for "breakfast, morning meds" at 8:00 a.m., "went to doctor for IV treatment/therapy" from 10:00 a.m. to 2:30 p.m.," followed by "lunch, meds" at 2:30 p.m., physical therapy from 4:30 p.m. to 5:30 p.m., and "dinner, evening medications, heat, ice packs, turn on video" in the evening hours. (*Id.* at 328.) The entry for May 24, 2002 is identical. (*Id.* at 326.)

### vi. Dr. Truchelut

CNA retained Dr. Eugene Truchelut to evaluate Plaintiff's medical records. (Defs.' 56.1 ¶ 117.) During the course of his evaluation, Truchelut reviewed Cameron's medical reports, Plaintiff's blood and MRI test results, the Physician Statement, the Investigative Options report and video surveillance, and the April 25, 2002 CNA functional assessment tool completed by Cameron. (Defs.' 56.1 ¶ 118; SS at 308-10.) On June 22, 2002, he delivered his first report, concluding that:

> [i]n assessing functionality, there are only a few reported physical, radiological and laboratory abnormalities. These include the (apparent, it is not really clear) swelling of the wrists discussed in January, the MRI study of the cervical spine which revealed degenerative disk disease and possible nerve root impingement, and of course the positive ELISA Lyme assay which was not confirmed on subsequent Western Blot testing.

(SS at 310.) He recommended "restrictions on very heavy lifting and on postures which would involve extremes in cervical ranges of motion." (*Id.* at 311.) He was "not able to assess the claimant's alleged cognitive deficits" because "there [were] no reports of a neurological examination or formal neuropsych testing in the file." (*Id.*)

On June 24, 2002, Truchelut spoke with Cameron by phone. Truchelut inquired about any "physical findings or results" that

5

would support the "subjective component" of Plaintiff's complaints. (*Id.* at 306.) According to Truchelut, Cameron "said that in dealing with the claimant's overall presentation, Lyme disease was his best working diagnosis. This was the way things started out last year, but the claimant has developed symptoms which he believes have elements of fibromyalgia and chronic fatigue syndrome." (*Id.*)

Cameron also told Truchelut that Plaintiff did "not appear psychotic or exhibit any signs of dementia in his interviews with her." (*Id.*) Cameron informed him that Plaintiff had never seen a neurologist, even though he had referred her to one, nor had there been any formal neuropsych testing of Scnhur's cognitive abilities or a mental status examination. (*Id.*) In addition, Truchelut recorded that Cameron had "not performed a mini-mental status examination on [Plaintiff], but [Cameron] said that [Plaintiff] has told him that she has difficulty completing tasks and following directions, and he feels that she has a sincere intent and motivation just from his experience in talking to her." (*Id.*)

Cameron also told Truchelut that he had referred Plaintiff to an orthopedist and a vascular surgeon but that neither specialist found evidence of pathology. (*Id.*) Thus, Cameron said, the symptoms remained attributed to Lyme disease. (*Id.*) After his discussion with Cameron, Truchelut's "impression remain[ed] the same," and he recommended the same restrictions on Plaintiff's physical activity as he had in his June 22, 2002 letter. (*Id.* at 307.)

vii. Initial Claim Denial

By letter dated July 2, 2002, CNA denied Plaintiff's application for benefits. (SS at 300-04.) Mitrani's five-page letter recounted the evidence that had been submitted by Plaintiff and Cameron, repeatedly citing the lack of examinations and objective evidence of disability. Mitrani explained that the "Lyme disease ELISA test was reactive, but the follow up Western Blot result was indeterminate and did not meet the CDC criteria for a positive test in either the IgM or IgG bands." (*Id.* at 301.) Mitrani also noted that "Dr. Cameron acknowledged that the results of the Lyme serum test had been equivocal, but he still felt that Lyme disease was a diagnosis that offered the most likely explanation for your symptoms." (*Id.* at 303.) Mitrani found that at Plaintiff's October 30, 2001 visit to Cameron, "[t]here was no documentation of a physical or mental status examination." (*Id.* at 301.) Further, he noted the normal ultrasound results from February and the unexceptional MRI scan of her brain. (*Id.* at 302.) Mitrani concluded:

> We do not see any evidence in the current medical records to establish that your condition imposes a physical or psychological impairment that would preclude you from engaging in the substantial and material duties of your regular occupation on a sustained basis. Therefore, at this time no benefits are payable under your Group Long Term Disability Policy.

(*Id.* at 303.)

b. Appeal of the Benefits Denial

Plaintiff appealed CNA's rejection of her claim. (SS at 263.) She then submitted a description of her job and examples of her work at CTC Corp. (*id.* at 130-35); blood test results (*id.* at 136-144); a report from physical therapist Maria Karen Macutay (*id.* at 145); various additional notes and records

6

from Cameron (*id.* at 146, 155-58, 161-223); a Lyme Disease Impairment Questionnaire filled out by Cameron (*id.* at 147-54); and a report from neurologist Dr. Albert Szabo (*id.* at 159-60).  Several of these items are summarized below.

### i.  Dr. Szabo

Cameron referred Plaintiff to neurologist Dr. Albert Szabo. (SS at 159.) Szabo issued a report to Cameron on July 2, 2002. (*Id.* at 159-60.) The report in the administrative file contains only two pages but indicates that it is three pages in length. (*Id.*) The report includes both Szabo's impressions of Plaintiff and his medical findings.  Szabo described Plaintiff as a "rather anxious woman." (*Id.* at 159.) "She does seem to have a little bit of difficulty staying on focus" and "is somewhat tangential in her conversation and needs to be refocused during the course of our conversation." (*Id.*) He also noted, however, that "[p]atient was alert and oriented," "her speech [was] fluent," and her "[c]omprehension is intact." (*Id.* at 159-60.) Further, he found, "normal repeating, normal naming, [and] normal calculation.  No right/left disorientation. Attention span is normal.  Mood and behavior are normal." (*Id.*) Szabo concluded that his neurologic impression "is Lyme disease, anxiety and depression, and paresthesias." (*Id*.) He did not make a finding as to whether Plaintiff was disabled in the two pages in the record.

### ii.  Karen Macutay

Karen Macutay, a licensed physical therapist, issued a one-page report on July 11, 2002, finding that Plaintiff had a decrease of range in motion throughout her body as well as weakness and pain in her joints. (SS at 145.) Macutay's diagnosis, based on "objective findings," was "multiple joint pain and generalized body weakness secondary to Lyme's [sic] Disease and possible Cervical and Lumbar Spine Radioculopathy and Myofascial Pain Syndrome." (*Id.*) The report concluded: "Patient is permanently disabled." (*Id.*)

### iii.  Dr. Cameron

Cameron submitted a letter to CNA, dated July 17, 2002, summarizing his treatment and diagnosis of Plaintiff.  In it, he described her symptoms and their "negative impact on her life," "including severe fatigue unrelieved by rest, nausea, impaired concentration, poor short term memory, inability to sustain attention, difficulty thinking, difficulty reading, difficulty writing, difficulty making decisions, confusion, migraines, fever/chills, generalized body pain (arthragia) and abdominal pain and vision problems." (SS at 155.) Cameron explained his diagnosis and conclusion as follows:

> On review of the blood test, the Lyme test was positive by ELISA testing.  The Western blot was indeterminate.  Nevertheless, the band for the IgM Western blot was a 41 band and for the IgM [sic] was also a 41 band.  These are bands that are typically seen in Lyme disease. In addition, the two-tier criteria, which is a criteria requiring a Western blot and ELISA is a seroepidemiologic criteria, used for counting cases and not intended for the use of diagnosis of Lyme disease, even the CDC advises against the use of a two-tier criteria for diagnosis.

(*Id.* at 157.)

Other notes newly submitted by Cameron recorded his "positive clinical

7

findings" of "swollen joints, right wrist inflammation and swelling, back and neck spasms, rashes, cervical and lumbar spine radiculopathy, and myofascial pain syndrome." (*Id.* at 103). He described her physical limitations as follows:

> She is weak and easy [sic] fatigability including an inability to hold her arms up more than brief periods. She stumbles frequently. She exhibits pain on palpitation. Her neck spasms easily. She has decreased range of motion of her neck and back. Her hands, fingers, and wrists remain swollen. She has weakness of the hip muscles and pain palpation of hip and knees.

(*Id.* at 106). He also described her cognitive impairments:

> [Plaintiff] finds it difficult to even follow basic instructions on a daily basis. She has to be instructed repeatedly and [have] material frequently reinforced. Conversations are often difficult to sustain. Susan exhibits delays in cognitive processing of information. She struggles to retrieve words, thoughts, names and often even simple ideas and objects that she is familiar with. She illustrates severe impairments/impediments with comprehension to such a degree that we add extra time for our communications.

(*Id.*)

### iv. Dr. Truchelut

CNA again retained Truchelut to review Plaintiff's claim. (SS at 97.) After reviewing her file, Truchelut concluded that "the additional information provided and reviewed above does not change my original impression." (*Id.* at 99.) He went on:

> Clinically, there are no reports of physical examination on the additional progress notes from [Cameron's] office, and the detailed physical and neuorological examination performed by Dr. Szabo was essentially all normal, which is in conflict with some of the findings reported by the physical therapist. There are no records included here from any of the other examining/treating physicians who allegedly saw claimant. Dr. Szabo's mental status examination did not provide confirmation of any significant cognitive difficulties. Based on what is available here, mostly on the basis of the musculoskeletal and cervical findings, some occupation restrictions would seem to be appropriate whether or not the diagnosis of Lyme disease is correct.

(*Id.*)

### v. Dr. Gerstenblitt

CNA also asked a second physician, Dr. Dan Gerstenblitt, who is board certified in internal medicine and occupational medicine, to review Plaintiff's claim. (SS at 86-90.) Gerstenblitt made three points in his report dated April 18, 2003. First, he labeled the diagnosis of Lyme disease "questionable." (*Id.* at 87.) He noted that Plaintiff did not meet the "Case Definition" for Lyme disease, which requires a positive Western blot. (*Id.*) Second, Gerstenblitt concluded that, even if Plaintiff did have Lyme disease, there was no reason she needed to stop working. (*Id.*) Finally,

8

Gerstenblitt cited inconsistencies between Plaintiff's statements, her daily activities log, and the report from Investigative Options. (*Id.*)  From this, Gerstenblitt concluded that Plaintiff's claim was "driven by self-reported complaints" and that "[t]here was no evidence of impairment present such that the claimant should have stopped working on 11/27/01." (*Id.* at 88.) Gerstenblitt concluded that there were "inconsistencies in the records [that] make one question the reliability of the claimant's self-reported symptoms." (*Id.*)

### vi. Denial of Plaintiff's Appeal

On May 2, 2003, CNA denied Plaintiff's appeal. (SS at 79-81.) Joye M. Kelly, the CNA Appeals Committee Member who was assigned to Plaintiff's appeal, found "no evidence" that supported the finding of a condition that would preclude Plaintiff from working. (*Id.* at 79.)  Kelly found that Plaintiff's diagnosis and disability was premised on Plaintiff's self-reported symptoms rather than clinical examination and testing. (*Id.* at 80.) Specifically, Kelly concluded that Plaintiff "continues to present with numerous self-reported complaints" even though "the clinical findings have failed to reveal any evidence of gross neurologic compromise or sequela documented in the records by minimal to no findings on clinical/physical examination." (*Id.* at 79-80.) With regard to the diagnosis of Lyme disease, Kelly concluded that even if Plaintiff did in fact have the disease, "a diagnosis and continued treatment are not evidence that support [Plaintiff's] perception that she cannot work [and] is no basis for disability . . . in the absence of medical findings that would document an impairment exists and that would preclude her occupational work activity." (*Id.* at 80.) Kelly's letter also cited the discrepancies in Plaintiff's daily activity log and the surveillance reports, which, in CNA's opinion, "further compromise[d] the validity of her continued self-reported complaints." (*Id.*)

### B.   Procedural History

On March 28, 2005, Plaintiff filed the Complaint in this action, naming as defendants "CTC Communications Corp. Group Disability Plan" and "CTC Communications Corp. as Plan Administrator." (*See* Compl. ¶¶ 6, 14-15.) The case was assigned to the Honorable Kenneth M. Karas, District Judge. Plaintiff filed an Amended Complaint on June 24, 2005, this time naming "CTC Communications Corp. Group Disability Plan" as the sole defendant. (*See* Am. Compl. ¶¶ 6, 14.)

Plaintiff filed the Second Amended Complaint ("SAC") on August 8, 2005, adding CCC as an additional defendant. (*See* SAC ¶¶ 6, 15.) Defendant LTD Plan then moved to dismiss Plaintiff's claim on the basis that CTC Corp.'s bankruptcy discharged all of its liability. CCC moved for summary judgment on the basis that it was not a proper party to the action. After the motions became fully submitted, the case was reassigned to my docket on September 4, 2007. After converting it to a motion for summary judgment, the Court denied LTD Plan's motion and granted CCC's motion. *See Schnur v. CTC Commc'n Corp. Group Disability Plan*, 621 F. Supp. 2d 96, 112 (S.D.N.Y. 2008).

On December 5, 2008, LTD Plan filed a third-party complaint against CCC for contribution and indemnity in case Plaintiff prevailed on her claim for benefits. On August 6, 2009, LTD Plan and CCC moved for summary judgment (Doc. No. 84), and Plaintiff cross-moved for summary

9

judgment (Doc. No. 85). The motions became fully submitted on October 1, 2009.

## II.  DISCUSSION

### A.  Legal Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a court may not grant a motion for summary judgment unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *accord Anderson*, 477 U.S. at 248. As such, "if there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment." *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (quotation omitted) (alteration in original).

### B.  Applicable Standard of Review

#### 1.  Deferential Standard Applies

"Although generally an administrator's decision to deny benefits is reviewed *de novo*, where . . . written plan documents confer upon a plan administrator the discretionary authority to determine eligibility, [a court] will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious." *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 82 (2d Cir. 2009) (quotation omitted); *accord Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Defendants have the burden of proving that the deferential standard of review applies. *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir. 1999).

The parties do not dispute that the plan documents vest discretionary authority to administer the plan and interpret plan terms in the Plan Administrator, CTC Corp., and CCC. (*See* SS at 24 ("The Administrator and other Plan fiduciaries have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to benefits in accordance with the Plan.").) The parties disagree, however, as to whether the LTD Plan, reinsurance agreement, and administrative services agreement clothed CNA with similar discretion.[2]

The administrative services agreement provides that CNA shall "review all Claims and determine whether the Claimant is

---

[2] Plaintiff objects to the Court's consideration of the reinsurance and administrative services agreements because they were never disclosed during the administrative review of Plaintiff's claim or under Defendants' initial disclosures pursuant to Rule 26. (Pl.'s Reply 4.) The Second Circuit has ruled that failure to place such documents in the administrative record does not bar a district court from considering them when determining the standard of review. *See Daniel v. UnumProvident Corp.*, 261 F. App'x 316, 318 (2d Cir. 2008). If Plaintiff believed that Defendants did not live up to their discovery obligations, she should have sought Court intervention during discovery, not at this late stage of the proceedings. In any event, as noted below, the Court finds that the discretion exercised by CNA was actually granted under the LTD Plan itself, and thus the administrative services agreement only confirms that CNA had effective final authority over claims.

eligible for her benefits and if so, the nature and extent of such benefits." (Administrative Services Agreement § 4.02(c).) Further, CNA was to notify claimants of denials and "establish a review committee with respect to Claims determinations to the extent required under ERISA." (*Id.* at § 4.02(i).) Thus, the administrative services agreement clearly makes CNA the final decision maker for most claims.

In this case, section 4.02(n) of the Plan vests discretion in the Plan administrator and all "other Plan fiduciaries." (SS at 24.) Other courts have found that claims administrators performing functions akin to those of CNA necessarily become ERISA fiduciaries. *See Winkler v. Metro. Life Ins. Co.*, No. 03 Civ. 9656 (SAS), 2004 WL 1687202, *2-3 (S.D.N.Y. July 27, 2004) ("The SPD invests MetLife with authority to evaluate claims and to review participants' appeals. MetLife is thus charged with an important discretionary role in implementing the Plan, and is a fiduciary for ERISA purposes."). Because CNA became a plan fiduciary pursuant to its responsibilities under the administrative services agreement, it also acquired discretionary authority through § 4.02(n)'s broad language. *Cf. Butts v. Continental Casualty Co.*, 357 F.3d 835, 838-89 (8th Cir. 2004) ("The plan need not spell out in intricate detail who has the discretion, other than to specify that those charged with implementing it will have such discretion.") Accordingly, the Court will apply the arbitrary and capricious standard in reviewing CNA's claim determination.[3]

---

[3] It is worth noting that the administrative services agreement and reinsurance agreement effectively transferred all of CCC's rights and liabilities under the Plan to CNA, rendering it a de facto successor-in-interest of CCC. (See Becker Decl. Exs. D & E.) Courts have frequently found that successors-in-interest succeed to any deference granted to the original administrator by the terms of the Plan. *See,*

Under this deferential standard, an administrator abuses its discretion where its decision "was without reason, unsupported by substantial evidence or erroneous as a matter of law." *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 623-24 (2d Cir. 2008) (quotation omitted). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] . . . requires more than a scintilla but less than a preponderance." *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003) (quotation omitted). Finally, the Court must evaluate "whether the decision was based on a consideration of the relevant factors." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995).

The Court is mindful that, "[n]otwithstanding the deferential nature of the arbitrary and capricious standard, courts have held that ERISA guarantees that the plan's administrator, the fiduciary, must provide full and fair review of the decision to deny the claim." *Neely v. Pension Trust Fund of the Pension Hospitalization & Benefit Plan of the Elec. Indus.*, No. 00 Civ. 2013 (SJ), 2004 WL 2851792, at *8 (E.D.N.Y. Dec. 8, 2004). In fact,

> review of a determination under th[is] standard is more than a perfunctory review of the factual record in order to determine whether that record could conceivably support the decision to terminate benefits. Rather, such a review must include a searching and careful determination as to whether the conclusion reached by the administrator in view of the facts

---

*e.g.*, *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 960 (9th Cir. 2006); *Giannone v. Metro. Life Ins. Co.*, 311 F. Supp.2d 168, 175 (D. Mass. 2004).

11

before it was indeed rational and not arbitrary.

*Rappa v. Conn. Gen. Life Ins. Co.*, No. 06 Civ. 2285 (CBA), 2007 WL 4373949, at *9 (E.D.N.Y. Dec. 11, 2007) (quotation omitted); *accord Juliano v. The Health Maint. Org. of N.J., Inc.*, 221 F.3d 279, 287 (2d Cir. 2000).

### 2.   Conflict of Interest

"[A] plan under which an administrator both evaluates and pays benefits claims creates the kind of conflict of interest that courts must take into account and weigh as a factor in determining whether there was an abuse of discretion, but does not make *de novo* review appropriate." *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008). "This is true even where the plaintiff shows that the conflict of interest affected the choice of a reasonable interpretation." *Id.*

Thus a conflict of interest is only one of several factors a court should consider when reviewing a benefits denial. *Id.* The weight accorded to the conflict of interest will vary depending on the record before the court. *Id.* "Where circumstances suggest a higher likelihood that the conflict affected the benefits decision, . . . the conflict of interest should prove more important (perhaps of greatest importance)." *Id.* (quotations and alterations in original omitted). The opposite is also true. "[W]here the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances," the conflict of interest should be accorded less weight, if any. *See Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2351 (2008).

In this case, CNA engaged in the sort of "walling off" that was appropriate to minimize any potential conflict of interest. (*See* Defs.' Supp. 22-23.)  CNA's argument is supported by the Declaration of Cheryl Sauerhoff, dated July 30, 2009, who is an "Appeals Team Leader" for Hartford Life Insurance Company, successor-in-interest to CNA. (*See* Sauerhoff Decl. ¶ 1.) Her declaration fully supports that CNA's financial and underwriting divisions were "walled off" from its claims administration divisions. (*See id.* at ¶¶ 12-16.) Further, the original claims evaluator, Mitrani, and the Appeals Committee Member, Kelly, operated in separate departments and did not discuss Plaintiff's claim. (*Id.* ¶¶ 8, 10.) Accordingly, the Court accords this factor relatively little weight. Nevertheless, the Court is mindful of the potential conflict engendered as a result of CNA being both the claims administrator and the de facto insurer of the LTD Plan, and will weigh this factor accordingly.

### C.   CNA's Denial Was Not Arbitrary and Capricious

Plaintiff's primary challenges to CNA's decision revolve around (1) CNA's reliance on the CDC case definition criteria for diagnosing Schnur with Lyme disease, (2) CNA's reliance on the opinions of Truchelut and Gerstenblitt, and (3) the adequacy of CNA's explanation in the July 2, 2002 denial letter. Thus, Plaintiff challenges both CNA's compliance with ERISA's notice requirements and whether CNA's decision was supported by substantial evidence.

### 1.   CNA Substantially Complied with ERISA's Notice Provisions

When a plan administrator denies a claim for benefits, Section 503(1) of ERISA requires that the administrator provide the

12

claimant with "adequate notice in writing . . . setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1). In addition, regulations require that plan administrators furnish to the participant

(i) The specific reason or reasons for the adverse determination;
(ii) Reference to the specific plan provisions on which the determination is based; and
(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary.

29 C.F.R. § 2560.503-1(g)(1). The "Second Circuit has indicated that substantial compliance with these regulations may suffice to meet § 1133's mandate of full and fair review, even when an individual communication from the administrator does not strictly meet these requirements." *Cook v. N.Y. Times Co. Long-Term Disability Plan*, No. 02 Civ. 9154 (GEL), 2004 WL 203111, at *6 (S.D.N.Y. 2004) (citing *Burke v. Kodak Ret. Income Plan*, 336 F.3d 103, 107-09 (2d Cir. 2003)). Substantial compliance "means that the beneficiary was 'supplied with a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review.'" *Id.* (quoting *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 690 (7th Cir. 1992)). The Court concludes that while CNA's notice was not exemplary, it nevertheless substantially complied with § 1133 and its accompanying regulations.

Plaintiff's original claim denial, dated July 2, 2002, is four and one half pages long and both sets forth the relevant Plan terms and discusses the evidence in and deficiencies of the record. For example, when recounting Plaintiff's October 30, 2001 office visit with Cameron, the denial stated "[a] Lyme disease ELISA test was reactive, *but the follow up Western Blot result was indeterminate and did not meet the CDC criteria for a positive test in either the IgM or IgG bands*." (SS at 301 (emphasis added).) Similarly, when describing Plaintiff's treatment for most of October 2001, the letter stated that

> you presented to Dr. Cameron with complaints of an inability to remember words, fatigue, disturbed sleep, and joint pains, which was interfering with your work and which had not improved with antibiotics. You requested a change in antibiotic to Rocephin. *There was no documentation of a physical or mental status examination at this time*. You were referred to a neurologist and tetracycline continued.

(*Id.* (emphasis added).) Finally, the July 2, 2002 letter referenced a conversation between Cameron and Truchelut that further articulated why Plaintiff's claim was denied:

> Dr. Cameron was asked if he could supply any physical findings or results of any other testing which might support *your subjective complaints*. Dr. Cameron indicated that with your overall presentation, Lyme disease was the best working diagnosis. . . . He believes you have an encephalopathy pattern of Lyme disease with a chronic history of cognitive difficulties, but to his

knowledge you have *never seen the neurologist he referred you to*, and the MRI of your brain was normal. Dr. Cameron was asked *if there had been formal neuropsych testing of your cognitive abilities or conduction of a mental status examination* and he stated that there had not been.

(*Id.* at 303 (emphasis added).)

Finally, the denial letter summarized exactly what was wrong with Plaintiff's application for benefits: "we do not see any evidence in the current medical records to establish that your condition imposes a physical or psychological impairment that would preclude you from engaging in the substantial and material duties of your regular occupation on a sustained basis." (*Id.* at 330.)

The Court thus finds that the July 2, 2002 letter substantially complied with ERISA's notice requirements. The letter informs Plaintiff and her treating physicians of what was lacking and, by extension, what additional material should have been submitted: evidence of objective examinations that scientifically document the extent of her physical and mental impairment. The sufficiency of CNA's notice is confirmed by Plaintiff's subsequent submissions. In order to supplement her application, Plaintiff saw a physical therapist and a neurologist, both of whom examined her and submitted reports on her behalf. (*See id.* at 145; *id.* at 159-60.) CNA considered both submissions on appeal. (*Id.* at 63-64). The fact that the reports of Macutay and Szabo were not what Plaintiff would have liked them to be does not render CNA's notice deficient.

CNA did omit, however, one important detail from the July 2, 2002 denial letter: namely, CNA did not disclose that it had relied on Plaintiff's lack of credibility based on the obvious inconsistencies between the reports of Investigative Options and her own statements. Plaintiff's credibility became a pronounced issue on appeal (*id.* at 80), and it was likely a factor in CNA's original decision as well.

Nevertheless, whatever prejudice might have resulted from the denial letter's failure to reference this aspect of CNA's review was cured by Plaintiff's review of the entire claim file on appeal. In fact, Plaintiff's attorney's February 14, 2003 letter to CNA spent two pages refuting the inconsistencies between Investigative Option's reports and Plaintiff's own statements. (*Id.* at 126-28.) Thus, the Court concludes that this omission in CNA's file did not deprive Plaintiff of a full and fair review of her claim. *Cf. Suren v. Metro. Life Ins. Co.*, No. 07 Civ. 4439 (JG), 2008 WL 4104461, at *9 (E.D.N.Y. Aug. 29, 2008) (finding that deficient notice in first appeal was cured by subsequent notice).

For the same reason, the Court rejects Plaintiff's argument that CNA denied her a full and fair review by setting forth her lack of credibility as a "new" factor on appeal. Courts are suspicious when claims administrators put forth new rationales for denying a claim on appeal. *See, e.g.*, *Diamond v. Reliance Standard Life Ins.*, No. 08 Civ. 7562 (SHS), 2009 WL 4279709, at *4 (S.D.N.Y. Dec. 1, 2009). Such skepticism, however, is not warranted in this case. Plaintiff and her attorney not only received the documents which contained Plaintiff's misstatements, but also submitted evidence to CNA in an effort to rebut these misstatements. (SS at 126-28.)

In sum, the Court finds that CNA's July 2, 2002 letter, coupled with Plaintiff's attorney's subsequent review of her file and correspondence with CNA, provided her with sufficient notice to satisfy the requirements of 29 U.S.C. § 1333 and the related regulations.

2. CNA's Decision was Supported by Substantial Evidence

a. Objective Evidence

The Second Circuit recently confirmed that "it is not unreasonable for ERISA plan administrators to accord weight to objective evidence that a claimant's medical ailments are debilitating in order to guard against fraudulent or unsupported claims." *Hobson*, 574 F.3d at 88. Citing a recent Eighth Circuit opinion, the Circuit explained that "even in a claim involving fibromyalgia, 'trigger-point findings . . . constitute objective evidence of the disease,' and it is not unreasonable for a plan administrator to require such evidence so long as the claimant was so notified." *Id.* (quoting *Johnson v. Metro. Life Ins. Co.*, 437 F.3d 809, 813-14 (8th Cir. 2006)). Thus, even for diseases and disorders with difficult etiologies and subjective symptoms, "'a distinction exists between the amount of fatigue or pain an individual experiences, which is completely subjective, and how much an individual's degree of pain or fatigue limits his functional capabilities, which can be objectively measured.'" *Magee v. Metro. Life Ins. Co.*, 632 F. Supp. 2d 308, 318 (S.D.N.Y. 2009) (quoting *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322, 323 (7th Cir. 2007)).[4]

---

[4] In *Hobson*, the court determined that the requirement of objective medical evidence was a reasonable interpretation of the plan at issue. *See Hobson*, 574 F.3d 88. In the LTD Plan, on the other hand, objective medical evidence is *expressly* required. (SS at 19.)

In this case, each of CNA's reviewing physicians considered the relevant objective and subjective evidence and reached a reasonable conclusion supported by the evidence in Plaintiff's file. Even though Plaintiff submitted limited findings of physical and cognitive disability (*see* SS at 103-06, 145), it was not unreasonable for CNA to conclude that this evidence was outweighed by other objective evidence. The record includes substantial evidence that supports CNA's finding, including a near absence of physical examinations by Cameron throughout his treatment of Plaintiff (*id.* at 63, 308), false statements made by Plaintiff in the course of applying for benefits (*id.* at 80), a normal mental status examination conducted by Szabo (*id.* at 159-60), a normal MRI conducted by Schoenberg (*id.* at 481-82), Plaintiff's failure to seek a psychological examination as directed by Cameron (*id.* at 306), and the specific findings of Macutay, as opposed to her conclusion (*id.* at 145).

Further, each reviewing physician articulated reasons for concluding that Plaintiff was not disabled. Truchelut specifically considered the objective evidence that was submitted, including Plaintiff's swollen wrists, cervical spine issues such as degenerative disk disease, and the ELISA Lyme analysis (*id.* at 310); his conversations with Cameron (*id.* at 306-07); Plaintiff's subjective complaints (*id.* at 308); all of Cameron's records (*id.* at 309, 63); and those of Plaintiff's other treating specialists (*id.* at 308, 63-34). He then concluded that, while Cameron clearly believes that Plaintiff is disabled, "there are no reports of physical examination on the additional progress notes from his office, and the detailed physical and neurological examination performed by Dr. Szabo was essentially all normal, which is in conflict with some of the findings reported by the physical therapist." (*Id.* at 65.) Further, the

15

cognitive limitations reported by Cameron were in conflict with the results of the mental status examination performed by Szabo. (*Id.*)  He went on, "there are no records included here from any of the other examining/treating physicians who allegedly saw the claimant." (*Id.*)  Truchelut did find, however, that based on the "musculoskeletal and cervical findings, some occupational restrictions would seem to be appropriate whether or not the diagnosis of Lyme disease is correct." (*Id.*)  He simply could not accept the unsupported conclusion that Plaintiff was "totally disabled."

Gerstenblitt's report is similarly well reasoned.  After reviewing the entire claim file, he concluded that that there was insufficient evidence to find that Plaintiff was disabled. (*Id.* at 88.)  Further, relying on medical literature, he found that Plaintiff's negative Western blot test *combined* with her failure to respond to antibiotics implied that she did not have Lyme disease. (*Id.* at 87.)  Finally, Gerstenblitt concluded that the inconsistencies between Plaintiff's statements and the reports of Investigative Options and her inconsistent behavior, gave reason to doubt her subjective complaints. (*Id.*)

Accordingly, the record reflects that there was ample evidence to support the denial of benefits in this case

b.   Independent Physicians

Plaintiff also objects to CNA's reliance on the findings of Truchelut and Gerstenblitt, especially in the face of Cameron's contrary findings.  The Supreme Court, however, has held that ERISA does not require a plan administrator to afford greater deference to the plaintiff's treating physician than that afforded to physicians retained by the administrator to review the case — provided that the evidence put forth by the claimant is not arbitrarily discredited by the administrator.  *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  Despite Plaintiff's arguments to the contrary, CNA did not disregard the opinions of Plaintiff's treating physicians: it just reached different conclusions based on the evidence in Plaintiff's claim file.[5]

Further, although Plaintiff makes much of the fact that Cameron is a Lyme disease expert, whereas Truchelut and Gerstenblitt are generalists, there is no requirement that CNA engage physicians specially trained in the diagnosis of Lyme disease to examine Plaintiff or her records.  To the contrary, in similar cases, courts have deemed it sufficient that doctors trained in internal medicine or occupational medicine were retained to review the Plaintiff's records.  *See*, *e.g.*, *Fitzpatrick v. Bayer Corp.*, No. 04 Civ. 5134 (RJS), 2008 WL 169318, at *14 (S.D.N.Y. Jan. 17, 2008).  As in those cases, Truchelut, who is board certified in internal medicine (SS at 311), and Gerstenblitt, who is board certified in internal medicine and occupational medicine (*id.* at 88), are more than sufficiently qualified to evaluate the extent of Plaintiff's disability.

\* \* \*

In sum, the Court concludes that CNA's decision that Plaintiff was not disabled was supported by substantial evidence.  Notwithstanding CNA's dual role, the Court finds that Defendants' denial of benefits was not arbitrary and capricious under the law.

---

[5]   In addition, it appears from the record that Cameron was never aware of Investigative Option's report or Plaintiff's inconsistent statements, which very well may have affected his evaluation of her self-reported complaints.

D. Attorney's Fees

"Although success on the merits is not, in theory, indispensable to an award of attorneys' fees under 29 U.S.C. § 1132(g)(1), rarely will a losing party in an action such as this be entitled to fees." *Miles v. N.Y. State Teamsters Conference Pension & Ret. Fund Employee Pension Benefit Plan*, 698 F.2d 593, 602 (2d Cir. 1983). This is particularly apt in an action for individual recovery of benefits, in contrast to suits on behalf of large groups of plan beneficiaries. *See Fase v. Seafarers Welfare & Pension Plan*, 589 F.2d 112, 116 (2d Cir. 1978). After considering the factors set forth in *Chambless v. Masters, Mates & Pilots Pension Plan*, 815 F.2d 869, 871 (2d Cir. 1987), the Court finds no cause to depart from this principle. Accordingly, Plaintiff's request for attorneys' fees is denied.

III. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. Plaintiff's cross-motion for summary judgment is DENIED. Plaintiff's request for costs and attorney's fees is also DENIED.

The Clerk of the Court is respectfully directed to terminate the motions located at docket numbers 84 and 85 and to close this case.

SO ORDERED.

RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE

Dated:  March 29, 2010
        New York, New York

\* \* \*

Plaintiff Susan Schnur is represented by Patrick Henry Busse, DeHaan Busse LLP, 300 Rabro Drive, Suite 101, Hauppauge, NY 11788. Defendant CTC Communications Corp. Group Disability Plan is represented by Mary L. Marshall & Shannon Jandorf, Marshall Law Group, 37 Walnut Street, Wellesley, MA 02481. Third-Party Defendant Continental Casualty Company is represented by Michael H. Bernstein & John T. Seybert, Sedgwick, Detert, Moran & Arnold, LLP, 125 Broad Street, 39th Floor, New York, NY 10004.

